27 F.3d 566
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tim and Cherie BURICH, Plaintiffs-Appellants,
v.
CUYAHOGA COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,
Defendant-Appellee.
 No. 94-3255.
 United States Court of Appeals, Sixth Circuit.
 June 14, 1994.
 
 Before: MARTIN, NORRIS, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal arises from the filing of a Sec. 1983 action by the plaintiffs, Cherie and Tim Burich, alleging that the adoption policies of the Cuyahoga County Department of Children and Family Services improperly deny them equal protection of the law solely on the basis of their race. Specifically, the Buriches contend that their effort to adopt one of their former foster children was thwarted by the defendant agency because the Buriches are Caucasian and the child is African-American. The limited issue now before us is whether the district court erred in failing to issue a preliminary injunction returning the child to the custody of the Buriches pending a final resolution of this adoption dispute.
 
 
 2
 On February 24, 1993, Shampail ("Shanni") Hitchcock was born to an African-American couple with a long history of substance abuse. In fact, all four of the children born to the Hitchcocks before Shampail's birth had been placed in the permanent custody of the Cuyahoga County Department of Children and Family Services because of the parents' inability to provide proper care for their children. Like other of her siblings, Shampail was born with a positive toxicology screen for cocaine; therefore, on February 26, 1993, the agency obtained temporary emergency custody of the child and placed her in the foster care of the Buriches, a Caucasian couple who in the past had provided foster care for other African-American children.
 
 
 3
 The provisions of Sec. 2151.412(C) of the Ohio Revised Code recognize that the initial goal of Ohio agencies granted temporary custody of children is to "rehabilitate and reunite the child's family." Consequently, the Cuyahoga County agency did not initially seek permanent custody of Shampail. When the birth parents were not able to make significant strides toward overcoming their drug addiction, however, the agency did seek a court order of permanent custody. Such an order was eventually issued, and the Buriches subsequently filed appropriate applications and documents to adopt Shampail as their own child. In the fall of 1993, however, the Buriches were informed by the agency that plans were being explored to place Shampail with an African-American couple who had previously adopted one of Shampail's siblings.
 
 
 4
 In November of 1993, the Buriches attempted to obtain from the Cuyahoga County Juvenile Court a temporary restraining order that would have prohibited removal of Shampail from the plaintiffs' home. On November 10, however, the juvenile court judge dismissed the motion after concluding that foster parents, under Ohio law, are not proper parties to such proceedings. Nevertheless, the Cuyahoga County Department of Children and Family Services began its "adoptive home study" as part of the Buriches' application process for the adoption of Shampail. As part of the "adoptive home study," the applicants were required to supply six reference letters to the agency as well as submit a "transcultural/transracial parenting plan." The plaintiffs, however, did not submit all the requisite references to the department. Furthermore, evidence was uncovered that Tim Burich had been unemployed since July of 1993 and that the family's only income was from unemployment compensation and foster care payments. Ultimately, the decision was made by the defendant to reject the Buriches' application and to place Shampail permanently in the home of the couple who had previously adopted the child's sibling.
 
 
 5
 On February 23, 1994, the plaintiffs filed suit in district court claiming that their Fourteenth Amendment rights to equal protection of the law were violated by the defendant when the "prevailing criterion for the summary removal of the infant [from the Buriches' home] was race." In their suit, the plaintiffs sought a temporary restraining order and a preliminary injunction forbidding the defendant from removing Shampail from the Burich home. In support of their request for relief, the Buriches attached affidavits from various experts willing to testify that any benefits derived from in-race adoptions were clearly outweighed by the strength of the bond that would have developed between Shampail and the Buriches, the only parents and caregivers she had known throughout her first year of life.
 
 
 6
 A hearing on the plaintiffs' claims was conducted in the district court on March 3, 1994. At that time, testimony was offered by the plaintiffs that recent policy changes at the agency mandated that "no black children would be placed in foster care with white parents." Questioning of Waheedah Abdul-Jabir, the chief supervisor of the Cuyahoga County foster home department, further established that race is a factor in foster home-placement decisions, and that since July 1993, the policy of the department has been to seek placement of children in same-race foster homes first, even if the foster parents were in local, non-governmental placement programs.
 
 
 7
 Abdul-Jabir also testified that she was asked her opinion by the agency officials involved in the adoption decision in this case because of the presence of a foster family in the equation. While testifying that she offered her opinion that Shampail should be adopted by the African-American family, rather than by the Buriches, Abdul-Jabir stated forcefully that "[r]ace had nothing to do with [her] decision. [Her] decision was based on the fact that there was a sibling" of Shampail living in the African-American home. In emphasizing the non-racial motivation in her recommendation, Abdul-Jabir hypothesized that she would have recommended placement with the family of a sibling regardless of the race of the prospective adoptive or foster parents.
 
 
 8
 Further testimony before the district court established that while race apparently played no part in Abdul-Jabir's recommendation, that factor was at least discussed by the agency prior to denying the Buriches' adoption request. When asked on cross-examination whether race played any role in the adoption decision of the agency, Abdul-Jabir candidly admitted, "It was one of the issues, but it was not the first. The first was the sibling. Then there was the income, and then there was the race."
 
 
 9
 In balancing the factors necessary to determine whether to issue a preliminary injunction, the district judge concluded that the plaintiffs had failed to establish a substantial likelihood of success on the merits of their claim of racial discrimination. While ruling that the published policy of the defendant regarding adoption is not constitutionally objectionable, the court noted that "there may very well be some question as to whether the published policy of the County is being properly implemented, and that requires further consideration and further evidence." The district judge also concluded that unspecified persons interested in the outcome of the proceeding might be harmed by issuance of a preliminary injunction and that the public interest would not be best served by such relief.
 
 
 10
 On March 3, 1994, the same day the district judge entered his decision on the preliminary injunction issue, the plaintiffs filed their notice of appeal. On March 28, the Buriches then filed with this court a motion for emergency injunctive relief, which was granted. At a hearing before a single judge on March 29, 1994, counsel for the defendant advised the court as follows:
 
 
 11
 The child is presently in the home of a family that has adopted a sister of that child. Since this hearing was had [in the District Court], another child has been born to the biological mother in this instance, and that child has also been placed in the home. There are presently three siblings within that home.
 
 
 12
 No emergency relief was granted to the plaintiffs after the defendant agreed to allow the Buriches a three-day visitation with Shampail in their own home. The court did order an expedited hearing on the emergency relief request before a three-judge panel of this court, however.
 
 
 13
 The emergency relief request was considered, as ordered, by a three-judge panel on April 4, 1994. On April 6, the panel concluded that an injunction pending appeal should not issue in this case, but further concluded "that the appeal should be advanced upon the oral argument calendar of the court." As a result, we heard oral arguments on this matter on May 4, 1994. After careful study of the record, we agree that injunctive relief was properly denied by the district court.
 
 
 14
 A challenge to the disposition of a request for a preliminary injunction is reviewed by this court under the abuse of discretion standard. Keweenaw Bay Indian Community v. Michigan, 11 F.3d 1341, 1348 (6th Cir.1993). Because a trial court's decision to grant or deny preliminary injunctive relief is accorded such great deference, the Court of Appeals will disturb such a decision only if the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir.1991).
 
 
 15
 The factors to be considered by a district court in deciding whether to grant a preliminary injunction are well established in this circuit. In making that determination, a court must consider: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. Keweenaw Bay Indian Community, 11 F.3d at 1348. As this court has previously held, however, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir.1985).
 
 
 16
 The plaintiffs in this case contend that they have a substantial likelihood of succeeding on the merits of their equal protection claim. In support of their position, the Buriches point to the written policy of the Cuyahoga County Department of Children and Family Services that "[t]he agency shall give preference and first consideration to the adoptive application of the foster parents over all other approved or potential adoptive homes for the child." The plaintiffs then argue that their preferred position in this particular adoption process was stripped from them solely because of their race and the further departmental policy stating that "[i]n considering the best interests of the child, the agency shall make reasonable efforts to place the child in a home of similar cultural, racial, and ethnic background."
 
 
 17
 The defendant submits that the adoption decision only considered the race of the prospective adoptive parents, but did not use that factor as the ultimate determinant in the placement of Shampail. The agency also notes that the required preference for the adoption application of the foster parents does not necessarily equate with required approval of that application. For example, in this case, the Buriches' failure to complete the various aspects of the application process by the time the agency was ready to place Shampail in an adoptive home and the presence of a sibling in the family of prospective adoptive parents who were not the girl's foster parents helped negate the preference that would have otherwise been accorded the Buriches' application.
 
 
 18
 Without deciding the merits of the larger question before the district court, that is, whether and to what extent adoption placements may be based upon the race of the prospective adoptive parents, we conclude that the district court did not abuse its discretion in denying injunctive relief. First of all, the record to this point is far from conclusive on the question of the plaintiffs' likelihood of success, for the reasons noted above.
 
 
 19
 Furthermore, the plaintiffs can point to no irreparable harm that they will suffer from the district court's decision not to issue a preliminary injunction. Although the pain and heartbreak that the Buriches must feel at the loss of Shampail from their home cannot be minimized, the fact is also clear that the plaintiffs possessed no vested right to adopt their foster child and must have been aware at all times that the agency had ultimate authority to make a reasoned decision about the placement of Shampail in a permanent adoptive home.
 
 
 20
 At this point, the harm to others from issuance of an injunction returning Shampail to the Buriches pending a final court determination in this adoption matter is also a real and serious consideration. The little girl who is the object of this legal battle between prospective adoptive parents may suffer serious emotional and psychological damage from the continual shifting of home environments. Moreover, as noted by the district judge, the siblings of Shampail also are interested in the outcome of this procedural maneuvering and may suffer from the removal of their "new" sister from their home so soon after the establishment of familial bonds.
 
 
 21
 The interests of the public in this dispute are in large measure neutralized by the attributes of the four "parents" involved in this case. Although the general public clearly has a special interest in ensuring that, in the words of Reverend Martin Luther King, Jr., "children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character," society also has an overriding concern in providing a loving, nurturing home for those children who, through misfortune and no fault of their own, must rely upon the government for family placement. Fortunately, in this case no suggestion appears in the record that either the Buriches or the family presently providing for Shampail are unfit parents or individuals incapable of providing the support necessary to assist Shampail in becoming a well-adjusted, productive member of society.
 
 
 22
 For the reasons set out above, we AFFIRM the judgment of the district court and REMAND this case for further proceedings.